UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 31  AM 10: 55

CLERK

BY_____
DEPUTY CLERK

DALE M. ADAMS,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )      Case No. 2:14-cv-201
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social Security,  )
                                 )
        Defendant.               )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR
ORDER REVERSING THE COMMISSIONER'S DECISION
AND GRANTING DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
COMMISSIONER'S DECISION**
(Docs. 11 & 12)

Plaintiff Dale M. Adams seeks Supplemental Social Security Income ("SSI")
benefits and, pursuant to 42 U.S.C. § 405(g), seeks reversal of the Social Security
Commissioner's decision that he is not disabled. He requests that the court either
establish a disability onset date of April 24, 2008, or remand for the development of
additional evidence. Plaintiff filed his motion (Doc. 11) on March 9, 2015, and the
Commissioner filed her cross-motion to affirm (Doc. 12) on April 28, 2015.

Plaintiff is represented by James C. May, Esq., and the Commissioner is
represented by Assistant United States Attorney David B. Myers.

**I.    Factual Background.**

Plaintiff is a forty-nine year old man who currently resides in White River
Junction, Vermont. Plaintiff is blind in his right eye, which has been replaced with a
glass prosthetic eye. He alleges a disability onset date of no later than April 24, 2008,
resulting from a combination of scoliosis, degenerative disc disease, post-traumatic stress
disorder, anxiety, social phobia, depressive disorder, blindness in one eye, and substance

abuse disorder in remission.  Plaintiff attained a G.E.D. in 1982.  Plaintiff's previous work included trimming trees and loading wood for a tree service company in the late 1990s. From 2002 to 2006, Plaintiff worked in general maintenance for a trucking and transport company, which included snow removal, painting, cleaning, and lawn care. Plaintiff was incarcerated from 2006 to 2008 and has been incarcerated for brief periods at various times since 2008.

### A.    Physical Impairments.

In June 2008,[1] Plaintiff became a patient at the White River Family Practice under the care of Nurse Practitioner Lynne Chow.  Plaintiff reported that it was difficult to work due to back pain that he had been experiencing for approximately two years and that he was not sure of the cause of his pain.  Ms. Chow observed that Plaintiff was alert and oriented and able to walk "slowly" and with "some difficulty," that there was no evidence of lumbar abnormalities, and that Plaintiff had some "point tenderness along the L2 and 3." (AR 735.)  Ms. Chow diagnosed Plaintiff as suffering from chronic lower back pain, and ordered x-rays of Plaintiff's spine, which revealed scoliosis and degenerative disc disease at L1 and L2. (AR 736.)  Plaintiff saw Ms. Chow again in August 2008, reporting that his back pain was worse, that he had not been able to engage in physical activity, and that taking 800 mg of Motrin three to four times per day had not been helping.  Ms. Chow observed "a right thoracic curvature" and point tenderness along L1 to L3, again diagnosed chronic lower back pain, and prescribed Naproxen. (AR 734.)

Plaintiff was thereafter incarcerated.  In September 2008, he complained of chronic back problems, and the prison clinic reported that he walked with "significant difficulty." (AR 988.)  In October 2008, he reported that his chronic pain was worsening and that he was experiencing some radiating pain and numbness in his left leg.  The

---

[1] Prior to Plaintiff's alleged disability onset date of April 24, 2008, Plaintiff complained of acute lower back pain and took Motrin, Ibuprofen, Flexeril, and Vicodin during his incarceration from 2006 to 2008.  A prison clinic's progress notes from 2007 noted that Plaintiff walked normally, had normal reflexes, had no point tenderness, and that there was no evidence of "nerve root compression." (AR 585.)  After his release in March 2008, Plaintiff saw Dr. Don Lacey, who observed that Plaintiff was alert but "moved a lot during interview" and who diagnosed Plaintiff as suffering from back pain and chronic anxiety.  (AR 1049.)

prison clinic reported "positive tenderness paravertebral muscles lumbar spine" and found that Plaintiff suffered from chronic back pain with radiculopathy. (AR 986.) Plaintiff was prescribed Piroxicam and Robaxin; Naproxen and Flexeril were discontinued. In November 2008, Plaintiff returned to the prison clinic to report that his current medication was not helping with his continuing chronic back pain. The clinic noted that there was no evidence of scoliosis, that Plaintiff had a full range of movement of his back without discomfort, that he was able to stand on his heels and toes with difficulty, that his reflexes were intact, and that he demonstrated no motor deficiencies.

After his release from incarceration, Plaintiff returned to Ms. Chow in January 2009. She observed that Plaintiff was alert and oriented, could heel and toe walk without difficulty, and his deep tendon reflexes were normal. She also noted Plaintiff had a right thoracic curvature and tenderness along the "T12 to L3 on exam and with forward bend," as well as that his straight leg raises were positive for pain.[2] (AR 1053.) Ms. Chow diagnosed "[l]ow back pain with DJD and scoliosis." (AR 1053.) She discontinued Plaintiff's prescriptions from the prison clinic and restarted Naproxen, and she referred Plaintiff for a consultation with a spine clinic.

Plaintiff returned to the White River Family Practice in January 2009 to see Dr. Julie Davis. Plaintiff reported pain in his lower lumbar area, that sitting or standing for any length of time was "quite uncomfortable," that "changing position hurt[]," and that walking "any length of time hurt[]." (AR 1052.) He also reported that he usually slept well but experienced pain when turning over. He denied numbness or tingling in his legs. Dr. Davis observed that Plaintiff "move[d] around relatively well," had normal deep tendon reflexes, had normal sensation in both legs, experienced some "minimal" discomfort with straight leg raises, and demonstrated leg strength of 5/5. (AR 1052.) At the time, Dr. Davis assisted in preparing a training and employment medical report to support Plaintiff's request for general assistance and food stamps, on which she reported

---

[2] A straight leg raise test requires the patient to lie flat while a doctor raises the patient's extended leg to determine if the patient feels back pain at certain angles, which, if so, is a positive test. *Valerio v. Comm'r of Soc. Sec.*, 2009 WL 2424211, at *3 n.12 (E.D.N.Y. Aug. 6, 2009). A straight leg raise test is used to diagnose nerve root compression or impingement.

that Plaintiff had chronic back pain, scoliosis, and arthritis that she expected would last six months and that Plaintiff's impairments "prevent[ed] him from sitting or standing for long and he cannot do more active lifting, etc." (AR 1094.) She also noted that she could not specify additional limitations to Plaintiff's functioning until further evaluation and rehabilitation had begun.

In February 2009, Plaintiff saw Dr. Dilip Sengupta for a spine consultation. During this visit, Plaintiff reported chronic low back pain, that his pain was three out of ten in the daytime, and that it was difficult to fall asleep because of the pain. He denied leg pain or radicular symptoms. Dr. Sengupta observed that Plaintiff was able to walk normally and was able to bend forward and backward fully. He also noted that Plaintiff exhibited flexibility, his straight leg raises were negative for pain, his reflexes were symmetrical, and he had no sensory or motor deficit in his lower extremities. Dr. Sengupta reviewed Plaintiff's x-rays from August 2009 and concluded that scoliosis was "minimal" and that none of the spinal curves were "significant enough to call it a scoliosis of any significant nature." (AR 1059.) Dr. Sengupta also concluded that Plaintiff had "reasonably good physical function," that the "majority of his problem [was] related to depression," that his back pain was minimal, and that his x-ray was "essentially normal." (AR 1059.) Dr. Sengupta therefore recommended physical therapy before further intervention or investigation. He opined that "with physical therapy [Plaintiff] may improve enough and may be fit enough to go for a vocational rehabilitation and to get some kind of gainful work." (AR 1059.)

In April 2009, Plaintiff returned to Ms. Chow regarding his continuing back pain. Plaintiff reported he attended physical therapy, but he stated that it did not seem to help. He also reported that he was experiencing numbness and tingling down his right leg and decreased sensation in his right ankle. Ms. Chow observed that Plaintiff was alert and oriented, could walk heel and toe without problems, and had normal reflexes and "good" strength. (AR 1133.) She further observed Plaintiff had some tenderness along the spine and that his straight leg raises were positive for his right leg. Ms. Chow diagnosed: "Chronic low back pain, continues with pain and symptomatology including

radiculopathy despite physical therapy and evaluation of spine clinic." (AR 1133.) She ordered an MRI, which revealed: "Degenerative spondylolysis and degenerative disc disease, most marked at the L3-L4 level with circumferential disc bulge and superimposed central disc protrusion effacing the ventral thecal sac and displacing the nerve roots at this level."[3] (AR 1126.) Plaintiff returned to Ms. Chow regarding his chronic back pain in June 2009, and he reported that Naproxen worked during the day but that he still had "a lot of difficulty with sleep." (AR 1132.) Ms. Chow noted that Plaintiff needed documentation for his food stamps and assistance forms because he was unable to work due to back pain, and she referred Plaintiff for a second spine consultation.

In August 2009, Plaintiff returned for a second consultation with Dr. Sengupta, who reviewed Plaintiff's MRI and noted that Plaintiff had completed "several" physical therapy sessions, including pool therapy, but without "much improvement." (AR 1125.) Dr. Sengupta determined that Plaintiff's MRI did not demonstrate "nerve root impingement." (AR 1125.) "Considering [Plaintiff's] depression and that he is neurologically intact and is quite flexible," Dr. Sengupta concluded that surgical intervention was not necessary, that Plaintiff should continue exercises at home, and that Plaintiff could have an epidural steroid injection if the pain was "significantly bothersome," which Plaintiff elected to do. (AR 1125.) Thereafter, Plaintiff received epidural steroid injections on August 31, 2009, and September 22, 2009. He sustained an "inadvertent dural puncture" during the first injection, which caused spinal headaches that later subsided. (AR 1119.) Plaintiff reported both "some benefit" and "significant pain relief" following the injections. (AR 1119, 1121.)

In October 2009, Plaintiff saw a physical therapist, Eric Hartmann, for a functional assessment. Mr. Hartmann noted that Plaintiff's overall participation level was high. He

---

[3] "The thecal sac is a membrane that surrounds the spinal cord and circulates cerebral spinal fluid." *Valerio v. Comm'r of Soc. Sec.*, 2009 WL 2424211, at *5 n.35 (E.D.N.Y. Aug. 6, 2009). It is "located in the spinal canal, below the lumbar spine, and it [also] protects the dangling nerve roots emanating from the rest of the spine." *Adamik v. Astrue*, 2009 WL 6337910, at *7 n.20 (S.D.N.Y. Aug. 3, 2009).

further noted that Plaintiff's gait was slow in speed and that he demonstrated decreased lumbar and cervical flexion, extension, and range of motion.  Plaintiff had to stop both functional strength testing and endurance testing because of pain.  Based on Plaintiff's vocational, recreational, and daily living goals and his "physical capacity findings," Mr. Hartmann concluded that Plaintiff had "insufficient exercise tolerance to successfully start [an] intensive functional restoration program" and that "intensive physical rehabilitation would not effectively meet" Plaintiff's needs.  (AR 1118.)  Mr. Hartmann recommended pre-program conditioning, including daily walking and basic stretching.  A November 2009 assessment by Mr. Hartmann reported that Plaintiff was experiencing "continued pain" that he was "very concerned about" and that Plaintiff had a "slightly impaired response to neurologic function tests in his extremities, but no focal deficit apparent."  (AR 1113.)

Plaintiff returned to see Mr. Hartmann in January 2010.  Plaintiff reported that he had continued walking daily over the previous few months, that he could walk for up to sixty minutes at a slow pace, and that he continued with some of the stretching exercises.  Plaintiff exhibited "mild weakness," straight leg raises produced "low back pain," and Plaintiff had to cease endurance testing and testing for lifting floor to waist due to pain.  (AR 1110.)  While Mr. Hartmann noted some "mild improvements in physical testing," he also noted that Plaintiff was still experiencing pain and Plaintiff believed physical activity was making his pain "worse."  (AR 1110.)  Mr. Hartmann further noted that Plaintiff had participated in only two of his scheduled conditioning sessions.  Notes from these sessions indicate that over the winter Plaintiff felt he was "getting worse" and that taking the bus to these sessions "ha[d] just about done him in."  (AR 1111.)  The notes further indicate a diagnosis of mild disc degeneration, that Plaintiff "ambulates at a slow pace," and that Plaintiff would need to "progress slowly" with his home exercise program.  (AR 1111-12.)

In February 2010, Plaintiff saw Dr. Rowland Hazard for health maintenance and low back pain.  Dr. Hazard noted "mechanical low back pain with no true radicular component."  (AR 1108.)  Plaintiff reported to Dr. Hazard that the two 2009 epidural

injections were not "really very helpful." (AR 1108.) Dr. Hazard noted that Plaintiff had undergone "extensive physical therapy"[4] and that Plaintiff stated that he believed, "personally," that rehabilitation was not "likely to be very helpful for him." (AR 1108.) Dr. Hazard observed that Plaintiff's trunk flexibility through the waist while standing was "very guarded with only a few degrees of extension and perhaps 15 degrees forward flexion with some complaints of back pain at both end ranges." (AR 1108.) He also observed that Plaintiff's seated straight leg raises were "negative bilaterally," that sensation in his lower extremities was "intact," and that the April 2009 MRI revealed "no clear structural indication for surgical intervention." (AR 1108.) Dr. Hazard noted that Plaintiff's "long-standing pattern of low back pain" was occurring in the "context of significant psychosocial issues." (AR 1108.)

After a discussion with Plaintiff, Dr. Hazard recommended that Plaintiff review medication options with a doctor in the Pain Center. Dr. Hazard also recommended a consultation with Dr. Robert McLellan, who thereafter met with Plaintiff. Plaintiff reported no leg weakness to Dr. McLellan, but he described "constant 7/10 back pain without radiation unless walk[ing] up or down hill." (AR 1231.) Plaintiff stated he was "not interested in more intensive rehabilitation." (AR 1231.) Dr. McLellan noted Plaintiff's current functioning as follows: "Uses public transport. Able to walk 3 miles at a reasonable [pace] without braces or ambulatory aids. No problems with public transport. No trouble with fine motor activities." (AR 1231.)

In May 2011, Plaintiff returned to Ms. Chow and reported that his chronic back pain had worsened during incarceration the previous year. Ms. Chow observed that Plaintiff was comfortable but experienced pain on palpitation "at SI joint" and pain for a forward bend, that Plaintiff performed heel and toe walks without difficulty, and that Plaintiff exhibited normal strength. (AR 1279.) Ms. Chow continued Plaintiff's

---

[4] It is not clear whether Plaintiff reported that he had undergone extensive physical therapy or whether Dr. Hazard reached this conclusion independently. In either case, the record reveals that Plaintiff had only started pre-program conditioning of walking and stretching in late 2009 with Mr. Hartmann, and in January 2010, Mr. Hartmann noted that Plaintiff had attended only two sessions.

Naproxen prescription for back pain.  Plaintiff returned to the White River Family
Practice in June 2011 and saw Dr. Angela Toms, who observed that Plaintiff was
comfortable and exhibited no distress.  Dr. Toms discontinued Naproxen and prescribed
Meloxicam for Plaintiff's back pain.  Plaintiff had another MRI in August 2011, which
revealed: "Central disc protrusion at L3-L4."  (AR 1221.)

In October 2011, Plaintiff saw an occupational therapist, Gregory Morneau, for a
residual functional capacity ("RFC") assessment.  Objective findings from Mr.
Morneau's assessment revealed that Plaintiff could sit for thirty minutes and could stand
for twelve minutes before needing to sit due to fatigue.  Further findings indicated
Plaintiff could ambulate 971 feet in six minutes, which was twenty-seven percent of
expectation for Plaintiff's age category, and could complete fifty-eight stairs, which "did
not appear to be his maximum."  (AR 1228.)  Plaintiff could lift eighteen pounds knuckle
to shoulder and thirty-five pounds overhead and could carry twenty-eight pounds for
thirty feet.  Plaintiff demonstrated a maximum grip force that Mr. Morneau noted was
"not functionally limiting."  (AR 1228.)  However, Plaintiff was unable to lift floor to
knuckle because he was "[u]nable to bend at back or squat to get to this level," and
Plaintiff tested below the first percentile on the fine motor coordination because "his
decreased vision [was] slowing him down."  (AR 1228.)  Mr. Morneau noted "near full
levels of physical effort" by Plaintiff and that the results of the assessment provided "a
reasonable estimate of his current abilities for the areas tested."  (AR 1228.)

During this same time period, Plaintiff saw Dr. Karen Huyck for a "work capacity
and disability evaluation."  (AR 1220-27.)  Dr. Huyck reviewed Plaintiff's medical
history, including the 2009 MRI, and noted that Plaintiff reported worsening symptoms
with no clear precipitating event.  Dr. Huyck recorded Plaintiff's current symptoms as
follows: "constant and dull" low back pain ranging from a seven to eight out of ten that
was worse with bending, kneeling, squatting, twisting, lifting, and walking and that
sometimes radiated down the back of his legs, as well as decreased range of motion of his
spine, constant neck pain, and right arm numbness every other day.  (AR 1220.)  She
recorded Plaintiff's current functioning as "fairly independent with activities of daily

living" that included dressing himself, showering, and cooking simple meals, although he could not complete most activities that involved bending forward "as this appear[ed] to be the motion that exacerbate[d] his pain the most." (AR 1220.) She noted: "He reports that he feels he might be able to work if it was within his physical limitations and if he could work completely alone because, 'I don't want to talk or be heard or be around people.'" (AR 1220.)

Dr. Huyck completed an examination of Plaintiff, observing that Plaintiff was alert and appropriate but disheveled and nervous, his speech was clear and coherent, and his affect was blunted. His gait was "relatively normal," as was his lower extremity strength and his sensory and reflex testing. (AR 1221.) However, Plaintiff's pain was worse with flexion and facet loading, he demonstrated limited lumbar range of movement, he was tender to palpation over the left lateral lumbar region, and he had difficulty with heel walking. While Dr. Huyck concluded there was no clear evidence of nerve root compression, she observed that Plaintiff had "debilitating low back pain," had exhausted conservative and interventional treatment, was not a surgical candidate, had "insufficient exercise tolerance for functional restoration," and that therapy had failed to increase his "physical demand for functional restoration" resulting in his condition worsening. (AR 1221.) She concluded that it was "clear" that Plaintiff was "not capable of engaging in substantial gainful employment because of both his depression and back pain." (AR 1222.) She acknowledged that Plaintiff's "significant depression" was a "major ongoing issue" and that his pain affected his mood as well. (AR 1220.) She concluded that Plaintiff met the criteria for Affective Disorders, "as manifested by his feelings of worthlessness, loss of interest, sleep disturbance, lack of motivation, psychomotor retardation, social withdrawal, and decreased concentration." (AR 1222.)

In January 2012, Plaintiff returned to Ms. Chow to complete vocational rehabilitation forms. Ms. Chow noted that Plaintiff appeared comfortable and exhibited no distress, that his back was "straight" with "no bony abnormality" but with a limited range of motion during a forward bend, that he was able to perform a toe walk but was unable to perform a heel walk due to pain, that his straight leg raises were negative, that

9

his extremities strength was 5/5, and that he demonstrated intact sensation and symmetric reflexes. (AR 1260.)

Plaintiff was then referred for a consultative orthopedic consultation, conducted on February 21, 2012, by Dr. Paul Ross. Dr. Ross observed that Plaintiff was disheveled, with a flat affect, but intellectually oriented to time and place. He noted that Plaintiff had a normal stance and gait and did not use an assistive device, that Plaintiff performed repetitive knee bends and toe lifts without difficulty, and that Plaintiff's reflex and sensory tests were normal. He also noted that Plaintiff was able to heel and toe walk, but with low back discomfort, and that both FABER tests provoked back pain. He found Plaintiff's indirect straight leg raises "negative bilaterally in contradistinction to standing effort" and straight leg raises "non-diagnostic." (AR 1246.) He concluded that Plaintiff had a full range of motion of both hips with back pain and that extension and flexion, while full, were "inhibited by subjective low back pain." (AR 1246.) Dr. Ross noted Plaintiff scarcely moved his neck because of "subjective, non-radiating nuchal pain"[5] and that Plaintiff resisted raising either arm above shoulder level because "it provoked subjective low back pain." (AR 1246.) Dr. Ross noted no spinal deformities. While Plaintiff reported pain to light palpation, Dr. Ross observed no palpable spasms.

Dr. Ross observed that Plaintiff could lift and carry up to twenty pounds continuously, up to fifty pounds frequently, and up to 100 pounds occasionally. He also observed that, without interruption and during a work day, Plaintiff could sit for eight hours and could stand and walk for two hours. He noted that Plaintiff did not need a cane to ambulate and that Plaintiff demonstrated normal use of hands and feet. He found that Plaintiff could frequently climb stairs and ramps, balance, stoop, kneel, and crouch, but that Plaintiff could only occasionally crawl and climb ladders and scaffolds. He also found that Plaintiff could continuously or frequently tolerate some work conditions, but that Plaintiff could only occasionally tolerate moving mechanical parts and could never

---

[5] "The nuchal area includes the nape, scruff[,] and posterior aspect of the neck." *Urena-Perez v. Astrue*, 2009 WL 1726217, at *5 n.22 (S.D.N.Y. Jan. 6, 2009) (citing Dorland's Illustrated Medical Dictionary 1153 (28th ed. 1994)).

tolerate unprotected heights or operate a motor vehicle. Dr. Ross noted Plaintiff's visual impairment, but he nonetheless found that Plaintiff "was able to avoid ordinary hazards in the workplace," including approaching people. (AR 1252.) He also found that Plaintiff was able to read ordinary print and a computer screen and was able to determine differences in the shape and color of small objects. While Dr. Ross concluded that Plaintiff could not "travel without a companion for assistance," Dr. Ross found Plaintiff could perform activities like shopping, could walk without an aid, could walk a block at a reasonable pace, could use public transportation, could climb a few steps at a reasonable pace without using a rail, could prepare a simple meal to feed himself, and could care for his personal hygiene. (AR 1254.)

Dr. Ross diagnosed the following: "Chronic Back Pain Syndrome, non-verifiable, without myelopathy or radiculopathy," "Chronic Neck Pain Syndrome, non-verifiable, without myelopathy or radiculopathy," "Degenerative Disc and Joint Disease Lumbar Spine, per report of imaging study," "Alcoholism, per report," "Affective Disorder/Depression, per report," "Nicotine Habituation/Addiction/Physical Dependence, per history," Functional Overlay, and "S/P Enucleation Right Eye, per history."[6] (AR 1247.) Dr. Ross concluded that Plaintiff's back and neck pain could not be "verified objectively," that his "degree of subjective disability [was] not supported by, or commensurate with, objective, and inconsistent, physical findings," and that there were no significant signs Plaintiff was incapable of "performing cross/dext[e]rous movements." (AR 1247-48.)

Following the consultation with Dr. Ross, Plaintiff saw Nurse Practitioner Krista Gould at the White River Family Practice to report that he was suffering from acute neck and back pain that was worse than usual. He reported that he had "pushed it" while performing the exercises for the consultation with Dr. Ross, which he believed caused his acute pain. (AR 1268.) Ms. Gould observed that Plaintiff was alert and oriented but moved slowly and with some discomfort, that Plaintiff demonstrated "paraspinal

---

[6] Enucleation indicates the earlier removal of Plaintiff's right eye. *See* Stedman's Medical Dictionary 650 (28th ed. 2006).

tenderness" of his upper and lower back that eased with "counterpressure," and that Plaintiff's straight leg raises were negative and his neurological exam normal. (AR 1268.) Ms. Gould prescribed additional medication and continued the Meloxicam prescription.

Plaintiff returned to Ms. Chow in November 2012 to complete his vocational rehabilitation paperwork. She observed that Plaintiff was comfortable and without distress but exhibited an antalgic gait[7] and "lumbar paraspinal tenderness on exam." (AR 1266.) Plaintiff also returned to Dr. Huyck for a follow-up examination on March 5, 2013, which yielded the following observations: "Gait is more antalgic than last visit. No exaggerated pain behaviors. He has difficulty with toe and heel walk because it makes his back sore. He has decreased sensation to pinprick in the posterolateral right leg. He has positive left [straight leg raise]." (AR 1383.) Dr. Huyck noted that Plaintiff reported his back pain was increasing in intensity, with some shoulder and anterior chest pain, and that his "depressive symptoms [were] worse." (AR 1383.) She also noted "small central disc protrusion at L3-4 on MRI over one year ago" and "significant impairment of ambulation (27% of distance expected for age) at last capacity testing with full effort noted." (AR 1383.) Dr. Huyck diagnosed chronic low back pain with "objective signs of radiculopathy." (AR 1383.)

Dr. Huyck ordered a second RFC evaluation, which she conducted on April 6, 2013. This evaluation revealed that Plaintiff had a sitting tolerance of thirty minutes but needed to stand thereafter due to back pain; that Plaintiff had a dynamic standing tolerance of thirty minutes with no difficulty; and that Plaintiff's ambulation was 947 feet after six minutes, which was thirty-four percent of the expected distance for his age and medical status. Plaintiff completed forty stairs with no rails and no deficit. Plaintiff demonstrated a lifting tolerance knuckle to shoulder of twenty-three pounds occasionally and thirty-three pounds maximum and a carrying tolerance for thirty feet of forty-three pounds occasionally and fifty-three pounds maximum; however, Plaintiff was unable to

---

[7] Antalgic, or analgesic, refers to a "reduced response to painful stimuli." *See* Stedman's Medical Dictionary 71, 99 (28th ed. 2006).

complete the overheard lifting tolerance test and the floor to knuckle lifting tolerance test in a standard squat position. He could lift floor to knuckle twenty-three pounds occasionally and thirty-three pounds maximum by "kicking his right left behind him like a golfer's lift." (AR 1469-70.) His fine motor coordination was assessed below the first percentile and, although slow, he tolerated the small parts test "consistently without rest." (AR 1469.) Dr. Huyck noted "near full levels of physical effort" but that Plaintiff was "limited from giving full effort with some material handling due to pain." (AR 1469.) She further noted that Plaintiff had "functional upper and lower body range of motion," except for a limitation of lumbar and thoracic spine rotation to the left and right. (AR 1470.)

Dr. Huyck found that Plaintiff's overall RFC included the following limitations: an inability to ambulate effectively, an inability to squat or lift from the ground, decreased sitting tolerance, impaired fine motor coordination, safe lifting up to twenty pounds occasionally, and activity-increased pain from a five to seven out of ten during testing. Dr. Huyck again diagnosed chronic low back pain with subjective and objective signs of radiculopathy and a significant impairment of ambulation that both "clearly" impacted Plaintiff's ability to function, which was also "compounded" by his depression. (AR 1471.)

**B.    State Assessments of Physical Impairments.**

On August 22, 2008, a State agency medical consultant, "S. Green," reviewed Plaintiff's treatment history while incarcerated and concluded that it was "insufficient" to establish a chronic medically determinable impairment in the absence of a current physical examination or imaging studies. (AR 1085.)

On December 18, 2008, S. Green conducted a "physical residual functional capacity assessment"; however, it appears this assessment included only a review of "all evidence in file" but did not include a physical examination of Plaintiff. (AR 1086.) The assessment included whether Plaintiff had certain exertional, postural, manipulative, visual, communicative, or environmental limitations. S. Green noted no manipulative, visual, communicative, or environmental limitations. With regard to exertional and

13

postural limitations, S. Green indicated that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; could walk and/or stand about six hours in an eight-hour work day; could sit about six hours in an eight-hour work day; could balance and climb ramps/stairs frequently; and could stoop, kneel, crouch, and crawl occasionally. (AR 1087-88.)  The evidence S. Green cited in support of these exertional and postural limitations included Plaintiff's treatment history that indicated that, as of November 2008, Plaintiff had a full range of motion of back without discomfort, no motor deficiencies, and no evidence of scoliosis, as well as Plaintiff's statements that he walked, cleaned the floors, prepared simple meals, did laundry, cared for a cat and fish, and shopped daily for groceries.

On April 21, 2009, a State agency medical consultant, Dr. Geoffrey Knisely, reviewed the December 2008 RFC assessment based on updated medical records and an examination of Plaintiff that indicated Plaintiff was "able to walk normally on heels and toes with a narrow based gait, flexible and able to bend forward and backward fully, [straight leg raises] negative at 90 degrees, knee and ankle reflexes symmetrical, no sensory or motor deficits in the [lower extremities]."  (AR 1095.)  Dr. Knisely therefore "affirmed" the December 2008 assessments of Plaintiff's exertional and postural limitations.  (AR 1095.)

### C.   Mental Impairments.

After his initial release from incarceration, Plaintiff saw Ms. Chow at the White River Family Practice in June 2008, and Ms. Chow recommended that Plaintiff continue taking Prozac.[8]  In September 2008, Plaintiff was reincarcerated.  During this time period, he underwent two mental status examinations that noted his mental health was normal and his risk of suicide was low, but that he experienced anxiety, a depressed mood, and obsessive/compulsive thoughts.  While incarcerated, Plaintiff saw Nurse Practitioner Jerry Caltrider for trauma-related nightmares, continued picking at scabs on

---

[8] Plaintiff began taking Prozac and Trazodone in late 2004 to treat his depression.  During his incarceration from 2007 to 2008, he was prescribed Prozac and Vistaril for depression and anxiety.

his body, and a depressed mood.[9]  Mr. Caltrider observed that Plaintiff was alert and
oriented, his affect was "full range and appropriate to the situation," his speech was not
loud or pressured, his thinking was linear, and his eye contact was good.  (AR 651.)
Plaintiff denied psychotic symptoms and suicidal or homicidal ideation.  Mr. Caltrider
determined Plaintiff was depressed and anxious and prescribed an additional drug to help
with anxiety and the urge to pick at his scabs.  Plaintiff saw Mr. Caltrider again in
September 2008.  Mr. Caltrider determined that Plaintiff had post-traumatic stress
disorder ("PTSD"), major depressive disorder ("MDD"), generalized anxiety disorder
("GAD"), and personality disorder.  (AR 678.)  Mr. Caltrider noted a Global Assessment
of Functioning ("GAF") score of 60.[10]  In November 2008, Plaintiff saw another nurse
practitioner, who diagnosed PTSD, MDD, GAD, and personality disorder, but who
concluded that Plaintiff's mood was stable and that no medication changes were
necessary.  (AR 676-77.)  Following his release, Plaintiff returned in April 2009 to see
Ms. Chow, who noted that Plaintiff was on Prozac and that Plaintiff reported that his
depression was "pretty stable."  (AR 1133.)

---

[9] While incarcerated prior to April 2008, Plaintiff saw Mr. Caltrider, who diagnosed Plaintiff
with depression, anxiety, and poor impulse control.  Just prior to his release in 2008, Plaintiff
was also seen at a prison clinic for a mental health assessment, which indicated a disheveled
appearance, a narrow affect, and an anxious but not depressed mood.  After his release in 2008,
Plaintiff saw Dr. Lacey, who diagnosed him with anxiety.

[10] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in
tracking the clinical progress of individuals [with psychological problems] in global terms.'"
*Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n,
*Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).  Plaintiff consistently
scored a 60, with a score as low as 45-50 and as high as 70.  "A GAF between 51 and 60
indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends,
conflicts with peers or co-workers).'"  *Id.* (quoting Am. Psychiatric Ass'n, *Diagnostic and
Statistical Manual of Mental Disorders* 34).  Plaintiff's lower scores of 45-50, however,
"indicate[] '[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no
friends, unable to keep a job).'"  *Parker v. Comm'r of Soc. Sec. Admin.*, 2011 WL 1838981, at *6
(D. Vt. May 13, 2011) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of
Mental Disorders* 32).

On May 20, 2009, Plaintiff saw Sara DeGennaro, a licensed clinical mental health counselor and licensed alcohol and drug counselor, for a psychological consultative examination. She reported that Plaintiff was early for his appointment but was "disheveled, shirt stained, hair uncut and uncombed, and his hygiene did not appear to be good." (AR 1097.) Plaintiff informed Ms. DeGennaro that on a daily basis he usually slept until noon, drank coffee, watched TV, played solitaire, attended his group sessions, and often rested during the day. He also reported that his roommate reminded him to take his medications and did most of the cooking, cleaning, and laundry. He stated that he did vacuum his room on occasion, which caused him pain. He described that he was in "a lot of physical pain and discomfort, related to his back problems." (AR 1097, 1099-1100.)

Ms. DeGennaro recorded Plaintiff's psychological status as follows: he was oriented in place and time to person and situation, he was "fairly" alert, his thought process was intact, and he was "generally coherent," although his speech was at a pressured rate and volume and he made eye contact with difficulty. (AR 1099.) She noted that Plaintiff described himself as feeling "very anxious" and "feeling so restless he cannot sit still," but he denied suicidal or homicidal ideation. (AR 1099.) Plaintiff's depressive symptoms included depressed mood, sleep difficulties, low energy, poor concentration, very poor attention, feeling trapped and lonely, feeling hopeless about the future, and using alcohol to induce sleep and to forget things that happened in the past. In terms of frequency, Plaintiff described daily symptoms of depression of "detachment from others, sleep difficulties, irritability, difficulty concentrating, losing interest in things he used to care about, feeling hopeless about the future, and somatic complaints." (AR 1100.)

Ms. DeGennaro concluded that Plaintiff did not appear to handle stress well, that he showed unusual fears and avoided groups, and that his mood "appeared depressed," as well as that Plaintiff's "physical pains [were] contributing to his depression, and vice versa." (AR 1099.) Ms. DeGennaro ultimately concluded that Plaintiff had an "affective mood disorder" and that it was possible he had progressed from "Conduct Disorder to

16

Antisocial Personality Disorder, as he has aged." (AR 1100.) She diagnosed depression, antisocial personality disorder, and a GAF score of 60, and she recommended "consistent counseling with the same therapist." (AR 1100.) She noted it was "unclear" whether Plaintiff's behaviors were "caused or exacerbated" by his alcohol dependence and that "continued sobriety" was necessary to determine if his behavior was related to his personality disorders or his addiction. (AR 1100.)

In October 2009, Plaintiff started group therapy at the Clara Martin Center to address the use of violence, intimidation, and minimization (AR 1390-98), and by December 17, 2009, one therapist noted his "marked growth." (AR 1468.) Plaintiff was thereafter reincarcerated, during which he saw Mr. Caltrider in March 2010. Mr. Caltrider noted Plaintiff was depressed and anxious, but he observed that he was also alert, well-kept, calm, clear, coherent, and exhibited an appropriate affect and goal-directed thought process. (AR 1172.) Mr. Caltrider diagnosed Plaintiff with PTSD, an anxiety disorder, and a GAF score of 60. Plaintiff saw Mr. Caltrider again in May 2010, at which time Plaintiff reported decreased anxiety and PTSD, that things were "going well" on his current medication, and that he no longer picked at his scabs. (AR 1155.) Mr. Caltrider observed that Plaintiff appeared alert, oriented, well-kept, calm, clear, coherent, and demonstrated an appropriate affect and goal-directed thought process. He concluded Plaintiff was "stable" and "doing well," with a GAF score of 70, despite continued diagnoses of anxiety disorder and PTSD. (AR 1155.)

After his release from incarceration, Plaintiff returned to the Clara Martin Center for mental health treatment, during which he participated in approximately three group therapy sessions addressing sobriety. (AR 1342-1344.) The Center also produced a narrative report of Plaintiff's psychiatric status which stated Plaintiff was "considerably" down, blue, and depressed; helpless and hopeless; irritable; tense; "moderately" worried; and that Plaintiff had felt "seriously" depressed and anxious over the last thirty days. (AR 1331.)

Upon his return to incarceration in approximately August 2011, Plaintiff saw Mr. Caltrider. Plaintiff reported a recent increase in depression and anxiety and that he had

17

started picking his scabs again. Plaintiff did not identity "any clear precipitant," denied current symptoms of PTSD, and reported no problems with sleep or appetite. (AR 1140.) Mr. Caltrider observed that Plaintiff appeared alert, oriented, well-kept, calm, clear and coherent although "spontaneous," and with an appropriate affect and goal-directed thought process. (AR 1140.) Mr. Caltrider again diagnosed an anxiety disorder, but a GAF score of 60 at that time, and noted that Plaintiff's increased acute symptoms might be related to his failure to take his medication on occasion.

During a September 2011 consultation, Dr. McLellan observed: "Dysthymia all life. Has had a depressed mood forever, finds little joy in life here and there, doesn't like to socialize, sleep good, [and] decreased energy and fatigue . . . . Feels anxious and agitated intermittently." (AR 1231.)

From September to December of 2011, Plaintiff resumed therapy at the Clara Martin Center to address coping with sobriety. Throughout these sessions, the Center noted that he "appeared in a good mood" and exhibited "normal affect, normal eye contact, and congruency." (AR 1346-47, 1350-51, 1353, 1355-57.) By November 2011, Plaintiff reported that he was "functioning better" after a medication change without any side effects and that he had a "significant decrease" in scab picking. (AR 1353.) He also reported being "more energetic," (AR 1355), and more alert, although he continued to experience difficulty sleeping. (AR 1356-57.)

In November 2011, Plaintiff initiated treatment with Dr. Kevin Buchanan, a psychiatrist at the Clara Martin Center. Plaintiff reported chronic depression and anxiety since a young age stemming from physical and sexual abuse he suffered as a child, but he denied psychotic symptoms or suicidal intent. Plaintiff further reported that therapy sessions and his current antidepressants had been "helpful" and that two of the medications prescribed while he was incarcerated were "miracle drugs" that helped him sleep and control nightmares he had most of his life. (AR 1316, 1232.) While Plaintiff described his mood as "improved," he also reported that he felt his mood was still "subpar," that he still experienced "significant anxiety," and that he was "tolerat[ing]" his

18

medications, although he had gained weight while taking them that was negatively affecting his back pain. (AR 1316.)

Dr. Buchanan observed that Plaintiff's attitude was cooperative; his behavior was normal and alert; his speech was normal; his affect was "mood-congruent"; his thought process was clear, coherent, organized, and goal-directed; and his thought content was normal without delusions, obsessions, dissociation, or suicidal or homicidal ideations. (AR 1320-21.) Dr. Buchanan nonetheless noted that Plaintiff's mood was sad and anxious. Dr. Buchanan diagnosed PTSD, dysthymia, GAD, social phobia, alcohol/cannabis dependence, nicotine dependence, attention deficient hyperactivity disorder, and a GAF score of 45-50. He reported Plaintiff's prognosis for both stabilization and complete recovery was "good." (AR 1321.) Because Plaintiff's disorders were improved but not resolved on his current medications, Dr. Buchanan discussed changing the dosage of one medication to see if it would help with Plaintiff's "mood" while reducing weight gain. (AR 1321.)

Plaintiff returned to Dr. Buchanan in January 2012 and April 2012. Dr. Buchanan observed during both visits that Plaintiff had a full affect and "engaged well," that his judgment and insight were intact, that his thought process was organized, and that he showed no delusions or suicidal or homicidal ideations. (AR 1366, 1446.) Plaintiff reported during the January visit that one medication, Celexa, was helping his mood and that another medication, Periactin, was controlling his nightmares. He further reported that he was still having a lot of anxiety and difficulty sleeping and was experiencing paranoia, but that he did not have thoughts of harming himself or others. Dr. Buchanan concluded Plaintiff was "improving" and increased the dosage of Celexa. (AR 1446.) Plaintiff reported during the April visit that his medications were not helpful, that "his mood [was] still down and he still ha[d] significant anxiety," but that he was sleeping better and without nightmares. (AR 1366.) Plaintiff agreed with Dr. Buchanan to try a new medication.

Plaintiff continued to receive additional counseling from the Clara Martin Center from March to July of 2012. Thereafter, he was incarcerated, but he resumed counseling

at the Clara Martin Center upon his release from prison in December 2012, with a continued focus on maintaining sobriety. (AR 1363-80.)  Throughout these sessions, the Center noted that Plaintiff "appeared in a good mood" and exhibited "normal affect, normal eye contact, and congruency." (AR 1365, 1368-71.)  On April 17, 2012, Plaintiff reported "medication stabilization" (AR 1367), and on May 8, 2012, Plaintiff further reported his progress "continue[d]" and that he was "more stabilized than he ha[d] ever been." (AR 1369.)  By June 1, 2012, Plaintiff reported that he had "returned to an active interest in and enjoyment of activities as his energy level increase[d], and his depression ha[d] lifted." (AR 1370.)  By July 6, 2012, Plaintiff reported that he was maintaining "emotional stability." (AR 1374.)

In June 2012, Plaintiff returned to see Dr. Buchanan, who observed that Plaintiff had a full affect and "engaged well," his judgment and insight were intact, his thought process was organized, and he showed no delusions or suicidal or homicidal ideations. (AR 1372.)  Plaintiff reported he was "doing pretty well" and that his medication was "really helping his mood and reducing his anxiety." (AR 1372.)  Dr. Buchanan concluded that Plaintiff was "doing pretty well." (AR 1372.)

Plaintiff was thereafter incarcerated until December 2012.  When he returned to counseling at the Clara Martin Center, notes from his monthly sessions revealed that from December 2012 until February 2013, he "appeared in a stable[] mood," with a normal affect, eye contact, and congruency. (AR 1378-80.)  An evaluation by Dr. Eve Zukowski on December 13, 2013, however, reported that Plaintiff was "considerably" worried; down, blue, and depressed; and "moderately" helpless, hopeless, and tense. (AR 1297.)  He further reported feeling "seriously" depressed and anxious over the past thirty days and having "serious" depression and anxiety at other periods in his life. (AR 1297.)  Plaintiff informed Dr. Zukowski that he wanted to see Dr. Buchanan "as soon as possible" because his depression and anxiety were "high," and Dr. Zukowski concluded Plaintiff had "ongoing mental health issues." (AR 1307.)  Dr. Zukowski observed that Plaintiff exhibited normal speech, full orientation, cooperative attitude, adequate "form of thought," goal-directed "thought content," adequate perception and concentration, and

concrete abstract thinking. (AR 1310-11.) However, she also observed that Plaintiff was unkempt and disheveled, guarded, and in denial, with a flat affect, a depressed mood, little to no insight, mildly-impaired social judgment, and impaired recent and remote memory. (AR 1310-11.) She noted a history of alcohol dependence. She also noted that Plaintiff reported that he played guitar and that he "like[d] to be good to people" and was "courteous." (AR 1309.) She concluded that he had a "moderate" medical problem but "considerable" mental health, vocational, and family/social problems necessitating continued medication and therapy. (AR 1310-11, 1315.)

On January 25, 2013, and February 15, 2013, Plaintiff reported to the Clara Martin Center that he was experiencing side effects from his medication (AR 1379-80), but that his alcohol cravings were "considerably reduced." (AR 1380.) Plaintiff saw Dr. Buchanan on February 28, 2013, reporting that his mood and anxiety "could be better," but that he was sleeping well without nightmares. (AR 1381.) He also stated he "'[h]ate[d]' to be around other people." (AR 1381.) Dr. Buchanan observed that Plaintiff had a full affect and "engaged well," his judgment and insight were intact, his thought process was organized, and he showed no delusions or suicidal or homicidal ideations. (AR 1381.) Dr. Buchanan opined that Plaintiff "seem[ed] to be doing ok." (AR 1381.) Plaintiff saw Dr. Buchanan again on March 6, 2013, because Plaintiff was feeling "quite depressed and anxious and over sedated," and Dr. Buchanan agreed to "taper down" one of Plaintiff's medications. (AR 1382.)

## D.   State Assessments of Mental Impairments.

On August 7, 2008, a State agency doctor, Dr. William Farrell, conducted a "psychiatric review technique," which Dr. Farrell's notes indicate was based on SSA forms and medical evidence in the record. (AR 1071, 1083.) Dr. Farrell indicated an affective disorder of MDD and an anxiety disorder of PTSD, as well as a relation of both disorders to substance addiction disorders and behavioral changes associated with the regular use of addictive substances. Dr. Farrell concluded that Plaintiff's disorders were "not severe" but imposed a "mild" degree of limitation on Plaintiff's functional activities of daily living, social functioning, and maintaining concentration, persistence, or pace.

(AR 1071, 1081.)  Dr. Farrell found no episodes of decompensation.  Noting that mental status assessments found Plaintiff's "attention/concentration and memory as adequate when he has been sober in jail," Dr. Farrell opined: "[A]lcohol would very severely impair his persistence and pace in a work setting.  Without alcohol, his history of PTSD and history of major depression imposes a not severe psychiatric impairment from a psych point of view."  (AR 1083.)

On July 16, 2009, a State agency doctor, Dr. Thomas Reilly, reviewed Plaintiff's updated mental health records in light of Plaintiff's claim of a "worsening condition" and "affirmed" Dr. Farrell's August 2008 determination.  (AR 1101.)  During this review, Dr. Reilly noted that Plaintiff was on the same medication regime, but had not consistently accessed recommended outpatient services, and that Plaintiff was in an "otherwise grossly intact psych status [with] respect to depressive and anxiety symptoms."  (AR 1101.)

## II.    Procedural History.

Plaintiff filed for SSI benefits on April 24, 2008.  His claim was originally denied on December 30, 2008 (AR 159-61), and on reconsideration.  (AR 164-66.)  At Plaintiff's request, a hearing before an ALJ occurred on June 1, 2011.  (AR 95.)  ALJ Masengill issued a written decision finding that Plaintiff was not disabled under the Social Security Act since his application date.  (AR 138-50.)  Plaintiff timely requested review.  The Appeals Council determined that the ALJ failed to consider functional capacity evaluation reports received after the ALJ's decision.  As a result, the Appeals Council remanded to the ALJ to obtain additional evidence regarding Plaintiff's alleged impairments and, if necessary, to obtain supplemental evidence from a vocational expert, in order to enable further consideration of Plaintiff's maximum RFC.  (AR 157-58.)  On remand, ALJ Martin convened a hearing on April 9, 2013, at which Plaintiff and a vocational expert, Christine Spaulding, testified.  (AR 41.)  On April 26, 2013, ALJ Martin issued a written decision finding that Plaintiff was not disabled under the Social Security Act since the date he filed for benefits.  (AR 20-33.)  Plaintiff timely requested review (AR 7-9), and on August 1, 2014, the Appeals Council denied review (AR 1-3),

making ALJ Martin's April 26, 2013 decision the final decision of the Commissioner. Plaintiff timely filed the present action, and his claim is ripe for judicial review pursuant to 42 U.S.C. § 405(g).

### III.  The ALJ's Application of the Five-Step Sequential Evaluation Process.

In order to receive benefits, a claimant must be "disabled" on or before his or her "date last insured" under the Social Security Act.  42 U.S.C. § 423(a)(1)(A).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(1)(A).

The Social Security Administration regulations outline the following "five-step, sequential evaluation process used to determine whether a claimant is disabled":

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations[.]"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks omitted).  At step five, "the burden shift[s] to the

Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, at step one, the ALJ found that Plaintiff had not engaged in any substantial gainful work activity since the application date. At step two, he found that Plaintiff has "medically determinable physical and mental impairments" that, "individually and in combination, significantly limit his ability to perform basic work activities." (AR 23.) The ALJ found Plaintiff's impairments that rose to the level of "severe" within the meaning of the Act consisted of degenerative disc disease, scoliosis, depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, social phobia, and substance abuse disorders including alcohol and cannabis dependence that are currently in remission. (AR 23-25.) The ALJ found that other impairments claimed by Plaintiff do not meet the definition of a severe impairment, including Plaintiff's loss of vision in one eye because it does not "result in any significant limitation in his ability to perform basic work activities" as Plaintiff was able to work for many years, play sports, and had not reported any limitation on his ability to see. (AR 23.) The ALJ found at the third step that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of any listed impairment. At the fourth step, the ALJ determined Plaintiff's RFC as follows:

> [T]o perform light work . . . except that he is able to sit, stand, and/or walk for only about 30 minutes at a time without changing positions. After that time, he must be able to either change positions or to take a couple minute[s] break in order to stretch before resuming work in the same position. He is able to occasionally climb ramps and stairs, but must avoid climbing ladders, ropes or scaffolds. He is able to scoop, crouch, and/or crawl occasionally. He is unable to perform any overhead work activity. He must have only incidental exposure to temperature extremes (specifically cold) and vibration. He is unable to perform tasks requiring binocular vision, including depth perception. He must avoid work at unprotected heights and/or work requiring extended close proximity to dangerous machinery. He is able to perform simple, unskilled tasks. He must work generally on his own and not in a team environment, but has an ability to work around co-workers and supervisors and can interact in a routine manner. He is able to interact with the general public on only a superficial and occasional basis.

(AR 25-26.)  Because Plaintiff had previously engaged in medium exertional work and because the ALJ determined Plaintiff could engage in only light work, the ALJ found Plaintiff unable to perform his past relevant work.  However, considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded at the fifth step that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform with his RFC and that therefore Plaintiff is not disabled within the meaning of the Social Security Act.  At step five, the ALJ relied on the testimony of vocational expert Christine Spaulding (AR 82-86), who testified Plaintiff would be able to perform jobs that include colater operator, price marker, and document preparer.  (AR 33.)

In concluding that Plaintiff has an RFC for light work, the ALJ made several determinations that Plaintiff challenges.  The ALJ considered Plaintiff's non-severe limitations, including his loss of vision in one eye, but found "no basis for any further reduction of" Plaintiff's RFC.  (AR 29.)  The ALJ also considered but gave limited weight to the opinions of Dr. Davis, Dr. Huyck, and Dr. Ross, as well as the opinions of medical and psychological consultants from the State Disability Determination Service. Plaintiff specifically challenges the ALJ's determination to give limited weight to the opinions of Dr. Davis and Dr. Huyck, as well as Ms. Chow, while affording substantial weight to the opinion of Ms. DeGennaro.

Finally, Plaintiff argues the ALJ erred in his credibility assessment of Plaintiff regarding Plaintiff's allegation of an inability to work due to his physical pain and mental impairments.  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible[.]"  (AR 26-27.)  The ALJ reviewed Plaintiff's medical and mental health records to conclude those records failed to "reveal evidence of medically documented objective findings and/or test results . . . and/or a treatment history that is consistent with the alleged severity of his symptoms and limitations."  (AR 27, 30.)  The ALJ further found that the record of Plaintiff's overall level of activity was "inconsistent

with his alleged inability to perform any sustained work activity but, rather, indicative of an ability to perform a significant range of work activity." (AR 28.)

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); *see also* 42 U.S.C. § 405(g). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Even if a court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for the Commissioner's. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984).

### B.    Whether the ALJ Failed to Follow the "Treating Physician Rule."

#### 1.    Whether the ALJ Provided Good Reasons for the "Limited Weight" Assigned to the Opinions of Treating Sources.

Plaintiff maintains that the ALJ erred in failing to accord controlling weight to Plaintiff's treating physicians' opinions that he was unable to work.[11] "The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the

---

[11] Plaintiff refers to the opinions of Dr. Davis, Dr. Huyck, and Ms. Chow. Ms. Chow, however, as a nurse practitioner is not a "medical source" pursuant to 20 C.F.R. § 404.1513(a). *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("[T]he diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician.").

record." *Selian*, 708 F.3d at 418; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (directing that opinions from treating sources are accorded "more weight" because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [any] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations"). Pursuant to 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), the ALJ must provide "good reasons" regarding "the weight" given to a treating source's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted). In order to "override" the opinion of the treating physician, the Second Circuit has held that the ALJ must consider, *inter alia*: "(1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418.

In this case, the ALJ gave "limited weight" to the opinions of Dr. Davis and Dr. Huyck. Plaintiff saw Dr. Davis once, on January 22, 2009 (AR 1052), and saw Dr. Huyck approximately four times, once in 2011 (AR 1220), once in 2012 (AR 1383), and twice in 2013 (AR 1383, 1469). As a result, neither physician had treated Plaintiff for a significant period of time, and neither physician is a spinal specialist. *See Selian*, 708 F.3d at 418 (directing consideration of the frequency of treatment with a treating source when evaluating that source's opinion). The ALJ rejected both doctors' opinions that Plaintiff is unable to work on the grounds that those opinions were inconsistent with their own examinations of Plaintiff and inconsistent with other evidence in the record.

First, as the ALJ observed, their opinions that Plaintiff is unable to work was not supported by their own notes and examinations of Plaintiff. While Dr. Huyck noted "debilitating low back pain," she recorded only that Plaintiff demonstrated a limited lumbar range of movement, was tender to palpation over the left lateral lumbar region, and had difficulty with heel walking. (AR 1221.) She further opined that it was "clear" Plaintiff was "not capable of engaging in substantial gainful employment because of both his depression and back pain" (AR 1222); however, she noted that Plaintiff was "fairly

independent with activities of daily living" that included dressing himself, showering, and cooking simple meals. (AR 1220.)  Similarly, although Dr. Davis concluded Plaintiff was unable to work, she observed that Plaintiff "moved around relatively well," had normal reflexes and sensation in both legs, experienced some "minimal" discomfort with his straight leg raises, and demonstrated leg strength of 5/5. (AR 1052.)  Their own assessments, therefore, do not fully support a finding that Plaintiff's back pain is so severe he is completely unable to work.

Second, the ALJ determined that their opinions were inconsistent with the record evidence.  While medically documented findings exist that could support the treating sources' opinions regarding Plaintiff's back pain, the ALJ considered this evidence to nonetheless conclude that it did not support a finding that Plaintiff's back pain is so severe he is unable to work.[12]  In doing so, the ALJ relied on the opinion of a specialist, Dr. Sengupta, who opined that Plaintiff's scoliosis was "minimal" (AR 1059), and that Plaintiff's initial MRI revealed "mild" disc degeneration and disk bulge and no "nerve root impingement." (AR 1125.)  The ALJ also relied on the opinion of Dr. Hazard that, while the April 2009 MRI revealed degeneration, there was "no clear structural indication for surgical intervention." (AR 1108.)

Finally, the ALJ specifically rejected Dr. Davis's 2009 opinion because she also stated at that time that she could not specify limitations on Plaintiff's ability to work until further evaluation and rehabilitation.  Although the ALJ's explanation regarding Dr. Davis could have been more fulsome in light of subsequent, but limited, rehabilitation attempts by Plaintiff, the ALJ adequately explained overall, through the provision of good reasons regarding inconsistencies with their own assessments and other evidence, why he chose not to rely on the treating physicians' opinions that Plaintiff is completely

---

[12] The ALJ noted that x-rays of Plaintiff's spine from July 2008 revealed scoliosis and degenerative disc disease at L1 and L2. (AR 23, 736.)  The ALJ further noted that an MRI from April 2009 revealed: "Degenerative spondylolysis and degenerative disc disease, most marked at the L3-L4 level with circumferential disc bulge and superimposed central disc protrusion effacing the ventral thecal sac and displacing the nerve roots at this level." (AR 23, 27, 1126.)

unable to work.[13] *See Halloran*, 362 F.3d at 32-33 ("[W]e emphasize that under the regulations, the Commissioner is required to provide good reasons for the weight she gives to the treating source's opinion.") (citation and internal quotation marks omitted).

>     2.    **Whether the ALJ Properly Assigned "Limited Weight" to the Opinions of Treating Sources.**

Assuming arguendo that the ALJ failed to proffer good reasons for the weight accorded to the treating physicians' opinions, remand remains unnecessary if, "considering the entire record and the ALJ's opinion," the ALJ nonetheless properly "applied the substance of the treating physician rule" because "the treating physician[s] issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32; *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (noting that, even if the ALJ errors on a procedural matter, remand is unnecessary if the application of the correct standard would lead to the same conclusion) (internal quotation marks omitted).

The ALJ examined the opinions of Dr. Sengupta and Dr. Hazard, as well as Dr. Ross, each of whom examined Plaintiff's imaging records and concluded they did not indicate a severe impairment that would correspond with Plaintiff's symptoms or an inability to perform any work. Significantly, Dr. Sengupta reviewed Plaintiff's x-rays to conclude that scoliosis was "minimal" and that none of the spinal curves were "significant enough to call it a scoliosis of any significant nature." (AR 1059.) He also reviewed Plaintiff's initial MRI, and, although he noted disc degeneration and disk bulge, he concluded it was "mild," there was no "nerve root impingement," and Plaintiff was "neurologically intact." (AR 1125.) Dr. Sengupta therefore recommended against surgical intervention, a conclusion with which Dr. Hazard concurred, noting that the 2009

---

[13] The Commissioner argues that the doctors' opinions that Plaintiff is unable to work is an opinion that Plaintiff is disabled, a decision which is reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."). The opinions of Plaintiff's treating doctors, however, also speak to the "severity" of Plaintiff's impairments, and the Commissioner is entitled to "use medical sources, including [any] treating source, to provide evidence, including opinions, on the nature and severity of [any] impairment(s)." *Id.* § 416.927(d)(2).

MRI revealed "no clear structural indication for surgical intervention." (AR 1108.) Dr. Ross similarly concluded that Plaintiff's back and neck pain could not be "verified objectively" and that his "degree of subjective disability [was] not supported by, or commensurate with, objective, physical findings." (AR 1247-48.)

In addition, the ALJ examined Plaintiff's treatment history to determine whether the evidence supported an opinion that Plaintiff's back pain was so severe that it precluded Plaintiff from engaging in any work. In particular, the ALJ noted observations of Plaintiff by treating sources while he was incarcerated and at the White River Family Practice which concluded that Plaintiff's limitations were minimal and unaccompanied by severe pain.[14] The ALJ also relied upon the observations of various physicians who examined Plaintiff, including Dr. Sengupta, Dr. Hazard, and Dr. Ross, as well as Dr. Huyck's October 2011 assessment.[15]

---

[14] The ALJ referenced the prison clinic's treatment of Plaintiff in November 2012, during which Plaintiff had a full range of movement of his back without discomfort, had intact reflexes, and demonstrated no motor deficiencies, as well as that he was able to stand on his heels and toes but with some difficulty. (AR 988.) The ALJ further referred to records from Plaintiff's primary care provider "as of 2012" (AR 28), which noted that Plaintiff appeared comfortable and exhibited no distress, that his back was "straight" with "no bony abnormality" but with a limited range of motion during a forward bend, that he was able to perform a toe walk but was unable to perform a heel walk due to pain, that his straight leg raises were negative bilaterally, that his extremities strength was 5/5, and that he demonstrated intact sensation and symmetric reflexes. (AR 1260.)

[15] In February 2009, Dr. Sengupta observed that Plaintiff was able to walk normally, was flexible, and was able to bend forward and backward fully, as well as that his straight leg raises were negative, his reflexes were symmetrical, and he had no sensory or motor deficit in his lower extremities. In February 2010, Dr. Hazard observed that Plaintiff's trunk flexibility through the waist while standing was "very guarded with only a few degrees of extension and perhaps 15 degrees forward flexion with some complaints of back pain at both end ranges" but that seated straight leg raises were "negative bilaterally" and that sensation in the lower extremities was "intact." (AR 1108.) In February 2012, Dr. Ross observed that Plaintiff had a normal stance and gait, was able to heel and toe walk but with reported low back discomfort, had normal reflex and sensory tests, had a full range of motion of both hips with reported back pain, performed repetitive knee bends and toe lifts without difficulty, and that indirect straight leg raises were "negative bilaterally in contradistinction to standing effort" and that straight leg raises were "non-diagnostic." (AR 1246.) He also noted no significant signs that Plaintiff was incapable of "performing cross/dexterous movements." (AR 1247-48.)

The ALJ therefore properly reviewed the "nature" of Plaintiff's back pain, the "amount" of medical evidence regarding the severity of that pain, and the "consistency" of opinions regarding that severity. *Selian*, 708 F.3d at 418. In doing so, the ALJ relied on "objective medical evidence," 20 C.F.R. § 416.929(a), including signs of "anatomical, physiological, or psychological abnormalities which can be observed" and "shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 416.928(b). This evidence revealed that over the course of Plaintiff's treatment, his straight leg raises and other assessments were not consistently positive for pain, and he consistently demonstrated normal reflexes and strength and no motor or sensory deficits, as well as normal or only a slight impairment in range of motion. There was thus evidence in the record that "contradicted" the opinions of Dr. Davis and Dr. Huyck regarding the severity of Plaintiff's back pain. *Selian*, 708 F.3d at 418. "Generally, the opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with the opinions of other medical experts" because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess*, 537 F.3d at 128 (citations, alterations, and internal quotation marks omitted); *see also Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (directing that on appeal courts must "defer to the Commissioner's resolution of conflicting evidence").

The ALJ thus properly considered, weighed, and resolved the conflicts in the evidence to conclude that certain opinions of Plaintiff's treating sources were not consistent with the "alleged severity" of Plaintiff's symptoms and impairments or his "alleged inability to perform any sustained work activity." (AR 27, 28.) *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (concluding it was within "the province" of the ALJ to resolve "conflicting" evaluations "plainly contained in the record). In doing so, the ALJ applied the correct legal standards and rendered a decision supported by substantial evidence in the record.

### 3.   Whether the ALJ Improperly Assigned "Substantial Weight" to the Opinion of a Consulting Source.

Plaintiff argues that the ALJ should not have assigned substantial weight to the opinion of Ms. DeGennaro, a counselor who evaluated Plaintiff once, and that the ALJ's reliance on Ms. DeGennaro's opinion precluded the ALJ from considering Plaintiff's treatment and alleged lack of improvement since that examination. Ms. DeGennaro opined that, at the time she examined Plaintiff, he was oriented to place, time, person, and situation; he was "fairly" alert and "generally coherent"; his short and long term memory were fair; and his thought process was intact and logical with no obvious racing thoughts or grandiosity. (AR 30, 1099.) She observed, however, that Plaintiff's speech was at a pressured rate and volume, that he did not appear to handle stress well, that he showed unusual fears and avoided groups, and that his mood "appeared depressed." (AR 30, 1099.)

While Plaintiff is correct that the Second Circuit has "previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination[,]" *Selian*, 708 F.3d at 419, Ms. DeGennaro's observations and opinions to which the ALJ assigned substantial weight are consistent with the observations and opinions of mental health practitioners who treated Plaintiff from approximately 2008 until 2013.[16] The ALJ therefore did not improperly credit the views of Ms. DeGennaro.

---

[16] A nurse practitioner who treated Plaintiff in prison observed over the course of Plaintiff's visits that Plaintiff was alert and oriented; appeared calm, clear, and coherent; his affect was "full range and appropriate to the situation"; his speech was not loud or pressured; his thinking was linear; and his eye contact was good. (AR 651, 1172, 1155, 1140.)  Similarly, the Clara Martin Center recorded over the course of Plaintiff's treatment in September to December of 2011, March to July of 2012, and January to February of 2013 that Plaintiff "appeared in a good mood" and exhibited "normal affect, normal eye contact, and congruency." (AR 1346-47, 1350-51, 1353, 1355-57, 1365, 1368-71, 1378-80.)  Plaintiff was also treated by Dr. Buchanan, who observed in November 2011 that Plaintiff's attitude was cooperative; his behavior was normal and alert; his speech was normal; his affect was "mood-congruent"; his thought process was clear, coherent, organized, and goal-directed; and his thought content was normal without delusions, obsessions, dissociation, or suicidal or homicidal ideations. (AR 1320-21.)  When Plaintiff returned to Dr. Buchanan in January, April, and June of 2012, Dr. Buchanan observed that Plaintiff had a full affect and "engaged well," that his judgment and insight was intact, that

*Cf. Selian*, 708 F.3d at 419 (noting the ALJ improperly credited the findings of a doctor who performed only one consultative examination over the doctor who treated claimant on a regular basis).

Plaintiff further argues that the ALJ improperly relied on Ms. DeGennaro's opinion that counseling and sobriety could lessen Plaintiff's depression and anxiety when Plaintiff maintains his condition has not improved since her evaluation. The ALJ reviewed Plaintiff's course of treatment with the Clara Martin Center, which included counseling from 2011 to 2012 on maintaining sobriety. As the ALJ noted, these "records reveal evidence of an improvement with treatment."[17] (AR 31.) The ALJ therefore properly considered Plaintiff's "medical history, opinions, and statements about treatment," as well as Plaintiff's own statements about his progress, since his consultation with Ms. DeGennaro. 20 C.F.R. § 404.1512(b)(1)(ii)-(iii). This evidence generally supported, rather than conflicted with, Ms. DeGennaro's opinion that Plaintiff's

---

his thought process was organized, and that he showed no delusions or suicidal or homicidal ideations. (AR 1446, 1366, 1372.)

[17] Specifically, the ALJ reviewed the following evidence that supported the ALJ's finding that Plaintiff's mental impairments and resulting limitations on his functioning were improving. In November 2011, Plaintiff reported to the Clara Martin Center that he was "functioning better" after a medication change without any side effects and that he had a "significant decrease" in picking at his scabs. (AR 1353.) He also reported being "more energetic" (AR 1355), and more alert. (AR 1356-57.) In January 2012, he reported to Dr. Buchanan that his medication was helping with his mood and nightmares, and, at that time, Dr. Buchanan concluded Plaintiff was "improving." (AR 1446.) Plaintiff continued his treatment at the Clara Martin Center through July 2012. On April 17, 2012, Plaintiff reported "medication stabilization" (AR 1367), and on May 8, 2012, Plaintiff reported his progress "continue[d]" and that he was "more stabilized than he ha[d] ever been." (AR 1369.) On June 1, 2012, Plaintiff reported that he "returned to an active interest in and enjoyment of activities as his energy level increase[d], and his depression ha[d] lifted." (AR 1370.) On July 6, 2012, Plaintiff reported that he was maintaining "emotional stability." (AR 1374.) Plaintiff also returned to see Dr. Buchanan in July 2012, reporting that he was "doing pretty well" and that his medication was "really helping his mood and reducing his anxiety." (AR 1372.) Dr. Buchanan concluded that Plaintiff was "doing pretty well." (AR 1372.) On January 25, 2013 and February 15, 2013, Plaintiff reported that he was experiencing side effects from his medication (AR 1379-80), but that his alcohol cravings were "considerably reduced." (AR 1380.) Plaintiff saw Dr. Buchanan on February 28, 2013, reporting that his mood and anxiety "could be better" and he hated to be around other people, but that he was sleeping well and without nightmares. (AR 1381.)

depression and anxiety are "moderate functional limitations," an opinion the ALJ expressly concluded was "consistent with the evidence of record as a whole." (AR 31.) *Cf. Selian*, 708 F.3d at 419 (explaining an ALJ errs in relying on a single consultative examination only when the ALJ makes "no effort to reconcile the contradiction or grapple with" findings that differed from that single consultation).

Although Plaintiff's GAF scores indicated moderate to severe limitations, the ALJ was not required to "reconcile explicitly every conflicting shred of medical testimony." *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983).[18] This conclusion is underscored when, as here, Plaintiff's own statements regarding his mental limitations are in conflict. Despite Plaintiff's testimony that he sought to avoid people and social interaction, Plaintiff reported that he frequently shopped and used public transportation, occasionally saw friends, and the many treating sources and physicians who evaluated Plaintiff noted no significant "difficulties" in "interacting" with him even at times when Plaintiff was undeniably depressed. (AR 24-25.) The ALJ's finding that Plaintiff "must work generally on his own and not in a team environment, but has an ability to work around co-workers and supervisors and can interact in a routine manner" and "is able to interact with the general public on only a superficial and occasional basis" is thus supported by substantial evidence in the record. (AR 25-26.) *See Zabala*, 595 F.3d at 410 (affirming an ALJ's determination supported by substantial evidence even though there "was some conflicting medical evidence"); *see also Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (directing that the "substantial evidence standard means once an ALJ finds facts, [a reviewing court] can reject those facts only if a reasonable factfinder would have to conclude otherwise") (internal quotation marks omitted).

---

[18] Plaintiff relies heavily on his inconsistent GAF scores to argue that the ALJ improperly relied on Ms. DeGennaro's assessment of a GAF score of 60. As Plaintiff points out, however, he tested from a severe (45-50), to a moderate (60), to a mild (70) limitation. Moreover, there is apparently no authority "holding that a GAF score—in and of itself—demonstrates that an impairment significantly interferes with a claimant's ability to work." *Parker v. Comm'r of Soc. Sec. Admin.*, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011).

C.      **Whether the ALJ Improperly Assessed Plaintiff's Credibility.**

In evaluating credibility, the ALJ was required to consider a claimant's statements about symptoms, including pain, but such statements "will not alone establish" a disability.  20 C.F.R. § 416.929(a).  There must also be "medical signs and laboratory findings" that support a conclusion that a claimant has "a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence" demonstrate a disability.  *Id.*  The ALJ must evaluate the "intensity and persistence" of a claimant's alleged pain by considering "all of the available evidence," including medical history, the medical signs, and laboratory findings and statements.  *Id.*  The ALJ must "then determine the extent to which [any] alleged functional limitations and restrictions due to pain . . . can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [those] symptoms affect [a claimant's] ability to work."  *Id.*  Symptoms, including pain, "will not be found to affect [the] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 416.929(b).

These regulations dictate "a two-step process for evaluating a claimant's assertions of pain":

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations and internal quotation marks omitted).  Evidence to be considered includes but is not limited to objective medical evidence, such as medical signs and laboratory findings; other evidence from medical sources, such as medical history, opinions, and statements about treatment received; and

> [s]tatements you or others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other statements you make to medical sources during the course of examination

35

or treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings[.]

20 C.F.R. § 404.1512(b)(1)(i)-(iii)

Here, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible[.]" (AR 26-27.) Plaintiff asserts that the ALJ improperly discredited his subjective complaints of pain based on his reported daily activities. However, the regulations expressly provide that an ALJ may consider evidence of "daily activities" when considering a claimant's complaints of pain, 20 C.F.R. § 404.1512(b)(iii), and whether that pain is "so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

In Plaintiff's case, reported daily activities included caring for his personal needs, preparing simple meals, completing some household chores such as laundry and dishes, using public transportation, and shopping for groceries. There was also no evidence that while incarcerated Plaintiff required any special accommodations. The ALJ therefore properly determined that Plaintiff's subjective complaints of pain were inconsistent with his reported daily activities. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (concluding ALJ "properly found" testimony about a claimant's limitation was "not fully credible" when, in part, claimant "was able to care for his one-year-old child, including changing diapers, that he sometimes vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer"); *see also Cichocki*, 729 F.3d at 178 (affirming ALJ's determination and noting ALJ's reliance on a "Daily Activities Questionnaire on which [the claimant] indicated that she performed numerous daily tasks, such as walking her dogs and cleaning her house, that are consistent with a residual capacity to perform light work").

Plaintiff's argument that the ALJ improperly considered Plaintiff's "conservative treatment" and found it was "not indicative of the severity of his physical and mental

impairments" (Doc. 11-1 at 21) misconstrues the ALJ's decision. Although an ALJ may not "impose" the "notion" that "the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered," *Burgess*, 537 F.3d at 129 (internal quotation marks omitted), the ALJ did not rely exclusively on evidence of a conservative treatment regime to reject Plaintiff's subjective reports of pain. Rather, the ALJ focused primarily on "medically documented objective findings and/or test results" to ascertain Plaintiff's credibility. (AR 27.) *See Burgess*, 537 F.3d at 129 (noting that a court should focus on "other substantial evidence in the record, such as the opinions of other examining physicians," to ascertain Plaintiff's credibility, despite a course of conservative treatment). The ALJ reviewed "laboratory diagnostic techniques," which included Plaintiff's x-ray and MRIs, 20 C.F.R. § 404.1528(c), as well as medical assessments and "opinions" regarding what his x-ray and MRIs revealed. 20 C.F.R. § 404.1512(b)(1)(ii). The ALJ also reviewed "medically acceptable clinical diagnostic techniques" and the "observable facts" gleaned from those techniques, including the observations of Dr. Sengupta, Dr. Hazard, Dr. Ross, and Ms. DeGennaro. 20 C.F.R. § 404.1528(b). In addition, this included a review of Plaintiff's "medical history" while incarcerated and while seeking treatment at the White River Family Practice and the Clara Martin Center, 20 C.F.R. § 404.1512(b)(1)(ii), which provided a "detailed, longitudinal picture" of Plaintiff's physical and mental impairments. 20 C.F.R. § 404.1527(c)(2).

Against this backdrop, the ALJ was "not required to accept [Plaintiff's] subjective complaints without question" but rather was entitled to "exercise discretion in weighing the credibility of [Plaintiff's] testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49. In this case, the ALJ properly determined that Plaintiff's subjective complaints of pain were not so limiting as to preclude Plaintiff from any work activity. *See Poupore*, 566 F.3d at 307 (affirming ALJ's finding that "subjective complaints of pain were insufficient to establish disability" because they were "unsupported by objective medical evidence tending to support a conclusion that he has a

medically determinable impairment that could reasonably be expected to produce the symptoms alleged").

### D.   Whether the ALJ Failed to Develop the Record Regarding Plaintiff's Loss of Vision in One Eye.

Plaintiff contends that the ALJ failed to develop a record of the extent to which his loss of vision in one eye results in a functional limitation when considered with his other physical and mental impairments.  Because a disability hearing "'is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'"  *Burgess*, 537 F.3d at 128 (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).  The ALJ must "'fill any clear gaps in the administrative record.'"  *Id.* at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).  If the ALJ "already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5 (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

It is undisputed that Plaintiff has complete loss of vision in one eye and has had a glass eye since he was thirteen.  (AR 23.)  Plaintiff testified regarding how his vision loss impacted his ability to work, including that his poor depth perception had resulted in boring holes of inconsistent depth while employed at Ethan Allen.  Plaintiff further testified that his depth perception is "gone" and that he cannot see if "somebody comes on the side of me," which he testified was dangerous in work settings and made him "look foolish" in other settings.  (AR 63.)  Plaintiff explained that his glass eye "gets gunky, and it looks like a mess," and "[i]f I don't see a mirror, I'll look like hell by the end of the day."  (AR 71.)  The ALJ evaluated this record evidence to conclude that his "loss of vision in one eye credibly results in limitation with regard to his ability to perform tasks requiring binocular vision including depth perception."  (AR 29.)  The ALJ concluded, however, that Plaintiff's loss of vision was not so severe as to preclude Plaintiff from work and social interaction because Plaintiff lost his eye when he was thirteen yet had been employed and had played sports since then.  (AR 23.)

Plaintiff points to Social Security Ruling 83-14 to argue the ALJ failed to assess his loss of vision with regard to the jobs he is able to perform. Social Security Ruling 83-14 directs an ALJ to consider whether a visual impairment "causes" a claimant "to be a hazard to self and others," which may "indicate" to the ALJ "that the remaining occupational base is significantly diminished for light work." SSR 83-14, 1983 WL 31254, at *5 (Jan. 1, 1983). To the extent that Plaintiff's visual impairment could be a hazard, the ALJ fully addressed the limitations stemming from this impairment by including in the RFC that Plaintiff "is unable to perform tasks requiring binocular vision, including depth perception," that Plaintiff "must avoid climbing ladders, ropes or scaffolds," that Plaintiff "must avoid work at unprotected heights and/or work requiring extended close proximity to dangerous machinery," and that Plaintiff "must work generally on his own and not in a team environment[.]" (AR 25.) It is also undisputed that Plaintiff is able to complete many of the additional tasks Social Security Ruling 83-14 lists that an ALJ may consider, including walking, climbing stairs, and avoiding hazards. *See* SSR 83-14, 1983 WL 31254, at *5 (noting "the manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate . . . that the remaining occupational base is significantly diminished for light work").

### E. Whether the ALJ's RFC Determination Requires Remand.

At step four, the ALJ's RFC analysis "regarding a claimant's functional limitations and restrictions [must] afford[] an adequate basis for meaningful judicial review, [must] appl[y] the proper legal standards, and [must be] supported by substantial evidence[.]" *Cichocki*, 729 F.3d at 177. The ALJ must also offer a "thorough examination" of "relevant limitations and restrictions" to determine a claimant's physical exertion requirements and whether any "specified modifications" are necessary. *Id.* at 178. In this case, the ALJ found a "physical exertion requirement[]" of light work, subject to certain modifications. 20 C.F.R. § 404.1567(b). Plaintiff nonetheless maintains that he cannot perform nearly all of the primary strength activities defined at a

light level of exertion because he "has a limited range of motion, and monocular vision, and has difficulty bending, squatting, and reaching." (Doc. 11-1 at 24.)

The ALJ found that Plaintiff could sit, stand, and walk for no more than thirty minutes, after which Plaintiff would need to change positions, a finding consistent with Plaintiff's own testimony that he could sit, stand, and walk for thirty minutes at the most. (AR 59-60.) Plaintiff also reported to Dr. Ross that he could walk up to sixty minutes at a slow pace (AR 1110), and he reported earlier that he could "walk 3 miles at a reasonable [pace] without braces or ambulatory aids." (AR 1231.) Dr. Huyck likewise observed during Plaintiff's most recent RFC evaluation on April 6, 2013, that Plaintiff had a dynamic standing tolerance of thirty minutes with no difficulty and that Plaintiff had a sitting tolerance of thirty minutes, after which he needed to stand due to back pain. (AR 1469.)

While Plaintiff's February 2012 examination revealed that Plaintiff could frequently climb stairs and ramps, balance, stoop, kneel, and crouch but could only occasionally crawl and climb ladders and scaffolds, the ALJ conservatively found the following limitations that Plaintiff could occasionally climb ramps and stairs, scoop, crouch, and/or crawl and must avoid climbing ladders, ropes, or scaffolds. Similarly, Plaintiff's February 2012 examination revealed that Plaintiff could occasionally tolerate moving mechanical parts and could never tolerate unprotected heights or operate a motor vehicle, and his 2013 evaluation revealed that he could not perform any overhead lifting, for which the ALJ fully accounted by finding that Plaintiff must avoid overhead work activity, must avoid work at unprotected heights, and must avoid work requiring extended close proximity to dangerous machinery. The ALJ also found that Plaintiff is unable to perform tasks requiring binocular vision, including depth perception, consistent with Plaintiff's own testimony that his depth perception is gone.[19]  (AR 23.)

_____

[19] The ALJ, however, concluded that further modification of Plaintiff's RFC based on Plaintiff's loss of vision was not warranted because Plaintiff had been able to work and play sports for many years and because Plaintiff reported no limitation regarding his sight on a 2008 Function Report. In addition, Plaintiff's February 2012 examination with Dr. Ross supports the ALJ's finding that no further modification was warranted in light of the assessment that Plaintiff could

The ALJ's RFC analysis further reflected Plaintiff's mental impairments, including his reported preference to avoid "people." (AR 1220.) The ALJ noted that Plaintiff generally reported difficulty leaving his home "due to a desire to avoid social interaction" and that he felt less social and preferred to avoid large crowds. (AR 26.) The ALJ therefore included limitations that Plaintiff must "work generally on his own and not in a team environment" and is "able to interact with the general public on only a superficial and occasional basis." (AR 25-26.)

In light of the foregoing, the ALJ's RFC analysis reflected a "thorough examination" of Plaintiff's "relevant limitations and restrictions" and relied upon substantial evidence for a finding that Plaintiff's "impairments did not preclude [him] from light work, subject to specified modifications." *McIntyre*, 758 F.3d at 151; *see also Cichocki*, 729 F.3d at 178 (examining whether RFC of light work, subject to specified modifications, was supported by substantial evidence and finding no error when it was and when the RFC addressed "all relevant limitations").

Plaintiff nonetheless argues that the ALJ should have also considered and accounted for limitations regarding his fine motor skills. The ALJ did note that one examination assessed his fine motor coordination below the first percentile (AR 29, 1469); however, the ALJ further noted that Plaintiff reported playing the guitar and videogames (AR 25, 28-29) and during a September 2011 consultation reported "[n]o trouble with fine motor activities." (AR 1231.) The ALJ therefore properly considered and weighed the evidence regarding Plaintiff's fine motor coordination, concluding that Plaintiff could perform only "simple, unskilled tasks" (AR 25), but ultimately found "no basis for any additional manipulative limitations." (AR 29.)

Finally, Plaintiff argues:

> The record shows that [Plaintiff] is able to stand for 30 minutes before taking a break and sit for 30 minutes before needing to stand. Under this scenario, and, hypothetically not allowing any time for resting, [Plaintiff] can at best sit for 4 hours a day and stand 4 hours a day, neither of which

---

avoid ordinary hazards in the workplace, was able to read ordinary print and a computer screen, and was able to determine differences in the shape and color of small objects.

> rises to the level of a "good deal" of each function. Because an RFC for
> light work requires standing or walking, off and on, for a total of
> approximately 6 hours, [Plaintiff] is not qualified for light work.

(Doc. 11-1 at 24.)  No evaluation of Plaintiff, however, revealed that Plaintiff had to

alternate between sitting for a total of thirty minutes and standing for a total of thirty

minutes, before taking a break, which would mean Plaintiff could sit and stand for no

more than four hours per workday.  Rather, Plaintiff himself testified that he could sit,

stand, or walk for at most thirty minutes before needing to switch activities.  Dr. Huyck

similarly observed that Plaintiff could sit for thirty minutes, but then needed to stand due

to back pain, and could stand for thirty minutes without difficulty.  Accordingly, there

was substantial evidence to support the ALJ's finding that Plaintiff could perform light

work, including sitting, standing, and walking intermittently throughout the work day.

*See Poupore*, 566 F.3d at 305 ("The full range of light work requires intermittently

standing or walking for a total of approximately 6 hours of an 8–hour workday, with

sitting occurring intermittently during the remaining time.").

### F.   Whether the Commissioner Sustained Her Burden Under Step Five.

Plaintiff challenges the ALJ's determination at step five that a "significant

numbers of jobs exist in the national economy that the claimant can perform."  *McIntyre*,

758 F.3d at 151 (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v)).  "An ALJ may

make this determination either by applying the Medical Vocational Guidelines or by

adducing testimony of a vocational expert."  *Id.*  Here, the ALJ relied on the testimony of

a vocational expert.  "An ALJ may rely on a vocational expert's testimony regarding a

hypothetical as long as 'there is substantial record evidence to support the assumption[s]

upon which the vocational expert based his opinion,'" *id.* (quoting *Dumas*, 712 F.2d at

1553-54), and "accurately reflect the limitations and capabilities of the claimant

involved."  *Id.* (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

Plaintiff argues that the ALJ's decision that there are a significant number of jobs

in the national economy that Plaintiff can perform is based on a "faulty hypothetical"

which, in turn, reflects limitations proffered by the ALJ that were not representative of

Plaintiff's actual limitations. (Doc. 11-1 at 25.) The limitations outlined by the ALJ in posing the hypothetical to the vocational expert tracked the ALJ's RFC assessment at step four. (*Compare* AR 25-26, *with* AR 82-84.) As the court found those limitations were supported by substantial evidence in the record, this aspect of Plaintiff's step five challenge must be rejected.

In the alternative, Plaintiff argues that the ALJ should have treated his case as one involving a borderline age. At step five, the ALJ must use certain "age categories" when determining a claimant's ability to do other work, which includes evaluation of whether a claimant is "closely approaching advanced age (age 50–54)." 20 C.F.R. § 404.1563(b), (d). The ALJ, however, should not "apply the age categories mechanically in a borderline situation." *Id.* § 404.1563(b) ("If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, [the ALJ must] consider whether to use the older age category after evaluating the overall impact of all the factors of your case."). While the regulations "do not clearly define the outer limits of a borderline age situation, this [c]ourt and others have held that six months is within the rule." *Souliere v. Colvin*, 2015 WL 93827, at *5 (D. Vt. Jan. 7, 2015) (citing cases).

Plaintiff contends that he will have "entered the six month look-back period" on February 25, 2015, as he will turn fifty on August 25, 2015. (Doc. 11-1 at 27.) The regulations provide that the ALJ must use the age category that "applies . . . during the period for which [the ALJ] must determine if [the claimant is] disabled," 20 C.F.R. § 404.1563, which means the ALJ must look to the age of the claimant and whether the claimant is within a few days or a few months of reaching an older age category as of the date of the ALJ's decision. *See Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012) (concluding that claimant was not borderline age when, on the date the ALJ issued decision, the claimant was almost eight months from his forty-fifth birthday); *see also Daniels v. Apfel*, 154 F.3d 1129, 1134 (10th Cir. 1998) (concluding that, consistent with the ALJ's burden at step five, the ALJ also bears the burden of "determining in the first instance what age category to apply").

As of the date of the ALJ's decision in this case, on April 26, 2013, Plaintiff was more than two years from his fiftieth birthday on August 25, 2015. Consequently, Plaintiff was not "a person closely approaching advanced age on the date of the ALJ's decision." *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1072 (9th Cir. 2010). The ALJ was therefore not required to consider "whether to use the older age category after evaluating the overall impact of all the factors of [Plaintiff's] case." *Id.* § 404.1563(b); *see also Byes*, 687 F.3d at 917-18 (holding that "section 404.1563(b) does not require that an ALJ apply an older age category in borderline situations" but that "the ALJ is required only to '*consider* whether to use the older age category'") (emphasis in original) (quoting 20 C.F.R. § 404.1563(b)).

## V.    Order.

For the foregoing reasons, the court DENIES Plaintiff Dale M. Adams's motion for an order reversing the Commissioner's decision (Doc. 11) and GRANTS the Commissioner's motion for an order affirming the decision of the ALJ dated April 23, 2013 (Doc. 12).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 31st day of August, 2015.

Christina Reiss, Chief Judge
United States District Court